**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PAUL TURNER, | ) | |
| individually and on behalf of a class of | ) | |
| persons similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 1948 |
| | ) | |
| vs. | ) | |
| | ) | Judge Kennelly |
| MORTON'S RESTAURANT | ) | |
| GROUP, INC., | ) | Magistrate Judge Schenkier |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
CLASS ACTION COMPLAINT AND COMPEL ARBITRATION**

Morton's seeks to insulate itself from liability to a potential class of its employees arising from an undisputable violation of the Fair Labor Standards Act (the "FLSA") by enforcing an arbitration policy and its corresponding collective action waiver which is contained in Morton's job application papers. There is no issue about Defendant's liability in this case[1] – Defendant's own documents attached to its motion clearly show that in January 2005, Morton's extended an offer of employment to Plaintiff which provided that Plaintiff would be paid an hourly wage of $3.49. *See*, Defendant's offer letter to Plaintiff, attached to Defendant's motion as Exhibit A3. This offered wage is lower than the statutory minimum wage in Illinois, even for tipped employees, which was $3.90 per hour in January 2005.[2] Thus, Defendant failed to properly pay Plaintiff the full amount of minimum wages due to him, and correspondingly also failed to

---

[1] While the Court must accept all well-pled facts as true for purposes of a motion to dismiss (*see, e.g., Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000), it is not necessary for Plaintiff to rely upon that standard here, given the documentation demonstrating Defendant's liability.

[2] In addition, Defendant's offer letter fails to explain to Plaintiff the relevant tip credit provisions of the FLSA, which is also a violation of the FLSA.

correctly calculate and pay Plaintiff the full amount of overtime wages due him. Despite this clear evidence of Defendant's liability in this matter, Morton's is now seeking to minimize or avoid its liability by requiring Plaintiff to submit his dispute to arbitration, pursuant to an arbitration policy drafted by Defendant which prohibits the initiation of class or collective actions and the consolidation of claims. The only reasonable conclusion to draw from these facts is that Defendant – a publicly traded company – has made a business decision that it is cost effective for Defendant to violate the FLSA, as long as Defendant can hide behind its arbitration policy. The policy insulates Defendant from having to defend an indefensible wage violation before this Court not only on an individual basis, but also as a collective action.

Defendant's arbitration policy is a contract of adhesion (if it is a "contract" at all) that purportedly requires Plaintiff to arbitrate all claims arising against his employer, in clear violation of legislative and judicial policy. The six-page policy is a maze of legal jargon – it does not mention the cost to Plaintiff of arbitration, or the allocation of costs among the parties; or that the rules of arbitration are a moving target that can change at any time. The disparity between the cost to litigate and the recovery to an employee, along with a host of other factors, patently reflect the policy's unconscionability. Moreover, Defendant has produced no evidence that Plaintiff ever even read its arbitration policy. Thus, Defendant's arbitration policy cannot withstand even the most basic scrutiny about unconscionability. The policy violates the standards applied to arbitration provisions as recently articulated by the Illinois Supreme Court and, therefore, Defendant's motion must be denied.

## **STANDARD OF REVIEW**

"When a plaintiff's claim is governed by an arbitration agreement, the relevant body of law is the Federal Arbitration Act ("FAA")." *Vasquez v. Central States Joint Board*, ___ F.

Supp.2d __, 2008 WL 595859 at p. 23 (N.D.Ill. 2008). "While the Supreme court has stressed in recent years that federal policy under the FAA favors the enforcement of valid arbitration agreements, . . . the Court has been equally adamant that a party can be forced into arbitration only if she has in fact entered into a valid, enforceable contract waiving her right to a judicial forum. . . . Whether the parties have agreed to arbitrate is determined under ordinary state law contract principles." *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 758-59 (7th Cir. 2001). In order to determine whether a valid agreement to arbitrate exists in this case, the Court must look to Illinois law, as Plaintiff's employment and Defendant's wrongful practices occurred in Illinois. *See also*, Arbitration Policy, ¶ B(11), attached to Deft.'s Motion as Exhibit A1.

## ARGUMENT

This Court should deny Defendant's motion to compel arbitration and dismiss the lawsuit because Defendant's arbitration policy is invalid (and because it may well have never been delivered to or seen by Plaintiff). In accordance with the Illinois Supreme Court's recent decision in *Kinkel v. Cingular Wireless LLC*, the policy here is both procedurally and substantively unconscionable, and should not be enforced by this Court.

The *Kinkel v. Cingular Wireless LLC* case

*Kinkel* is the latest word from the Illinois Supreme Court on unconscionability. *Kinkel v. Cingular Wireless LLC,* 223 Ill.2d 1 (2006). The case involved a class action claim brought by a customer against her cellular telephone company. The plaintiff entered into a two-year service contract with Cingular. The contract contained a $150 "liquidated damages fee" to be paid by plaintiff to defendant if she terminated the contract early. *Id.* at 5. Plaintiff cancelled the contract before its expiration date; Cingular charged her the $150 fee, which she paid under

protest.  *Id.*  Plaintiff then filed suit, alleging the early termination fee was an illegal penalty, a breach of the service agreement, and fraud under the Illinois Consumer Fraud and Deceptive Business Practices Act.  *Id.* at 4-5.

The service agreement contained a clause which required that claims be submitted to arbitration.  *Id.* at 7.  It also provided that "no arbitrator has the authority to . . . order consolidation or class arbitration".  *Id.* at 8.  In addition, the agreement was silent about the cost of arbitration.  Cingular argued that the agreement stated the cost of arbitration would be borne equally by the parties, but the court noted that no such provision existed in the agreement.  Instead, the only reference to the cost of arbitration was that cost would be determined in accordance with the AAA rules, which were incorporated into the agreement solely by reference.  *Kinkel*, 223 Ill.2d at 8.  Moreover, the agreement merely stated that such cost information was available from defendant or AAA "upon request".  *Id.*

After plaintiff filed suit, defendant moved to compel arbitration and dismiss the complaint.  The trial court denied defendant's motion and held that the entire arbitration clause of the service agreement was unconscionable and, therefore, unenforceable.  *Id.* at 6.  The appellate court reversed in part, and held that the arbitration clause was enforceable, but that the agreement's limitation on class action arbitrations was unconscionable and unenforceable.  *Id.* The Illinois Supreme Court noted that the parties did not challenge the appellate court's ruling regarding the enforceability of the arbitration agreement itself; instead, the issue on appeal was whether the appellate court correctly struck down the class action waiver contained in the agreement as unconscionable.  *Id.* at 22.  After completing a thorough analysis, the Court

4

affirmed the decision of the appellate court and held that the class action waiver was indeed unconscionable. *Id.* at 48.

In reaching its decision, the Court explained that it must look to state law grounds of unconscionability to determine whether the clause was unenforceable. *Kinkel*, 223 Ill.2d at 20-21. The Court also noted that pursuant to its decision in *Razor v. Hyundai Motor America*, 222 Ill.2d 75 (2006), a finding of *both* procedural and of substantive unconscionability was *not* required in order to render a contract or a contract provision unenforceable. *Id.* at 21. Instead, a finding of unconscionability "may be based on either procedural or substantive unconscionability, or a combination of both." *Id.* In addition, the Court explained that while the precise issue in *Kinkel* was whether the class action waiver was unconscionable, that question could not be answered without examining the provision in the context of the agreement as a whole, and "against the backdrop of the precise claim made by the plaintiff." *Id.* at 22.

The Court began its analysis by examining whether procedural unconscionability existed. It explained,

> Procedural unconscionability refers to a situation where a term is so difficult to find, read or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it. This analysis also takes into account the disparity of bargaining power between the drafter of the contract and the party claiming unconscionability. * * * Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice. Factors to be considered are all the circumstances surrounding the transaction including the manner in which the contract was entered into, whether each party has a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print; both the conspicuousness of the clause and negotiations relating to it are important, albeit not conclusive factors in determining the issue of unconscionability.

*Id.* at 22-23 (internal citations omitted)(citing and quoting *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill.App.3d 980 (1980)).

The Court then examined the agreement and the circumstances surrounding its execution. It noted that while the contract was one of adhesion, such contracts, particularly in the consumer realm, are "a fact of modern life", and not all of them can be held procedurally unconscionable. *Id.* at p. 26.  However, the Court found it significant that the agreement did not put plaintiff on notice that "she would bear any of the costs associated with arbitration", and thus concluded that there was a "degree of procedural unconscionability in the service agreement." *Kinkel*, 223 Ill.2d at 26-27.  The court held that, while the degree of procedural unconscionability alone was insufficient to render the provision unenforceable by itself, it was "a factor to be considered in combination with our findings on the question of substantive unconscionability." *Id.* at 27.

Accordingly, the Court then analyzed the degree of substantive unconscionability present in the Cingular agreement.  First, the Court explained its previous holdings that the term "substantive unconscionability" included contracts that were "improvident, oppressive, or totally one-sided," or "inordinately one-sided in one party's favor." *Id*. at 28.  The Court also noted that definitions of substantive unconscionability which arose in case law between two commercial entities was of "limited usefulness" in a claim between a customer and a commercial entity. *Id.* The Court then defined substantive unconscionability as follows:

> Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed. . . . Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.

*Id.* The Court also explained that the nature of the underlying claim is relevant to the inquiry. *Id.* at 29.  It noted that claims which are "not likely to be recognized, let alone successfully argued in court or arbitration, without the aid of an attorney" were particularly troublesome. *Id.*

The Court explained that a typical consumer cannot be expected to know the arcane substantive body of law relating to liquidated damages provisions. *Id.* Moreover, the Court explained that when considering the cost-price disparity factor of substantive unconscionability, it must consider the cost to plaintiff of attempting to vindicate her claim (i.e. - costs plus attorneys' fees) versus the total recovery plaintiff would receive if she wholly prevailed on the merits of the claim, and whether the cost versus recovery analysis would make plaintiff whole. *Kinkel*, 223 Ill.2d at 29-30. Accordingly, the Court analyzed Kinkel's claim as follows:

> The typical consumer may feel that such a charge is unfair, but only with the aid of an attorney will the consumer be aware that he or she may have a claim that is supported by law, and only with the aid of an attorney will such a consumer be able to make the merits of such a claim apparent in arbitration or litigation. Thus, when considering the "cost-price disparity" factor of substantive unconscionability, we must consider that the cost to plaintiff of attempting to vindicate her $150 claim, in the absence of the ability to bring a class claim, would be $125 plus her attorney fees. As a result, if she were to prevail on the merits of her claim and be awarded $150 in damages, it is an absolute certainty that she would not be made whole."

*Id.* at 30 (internal citations omitted).

Regarding the class action waiver in particular, the Court examined similar cases from other jurisdictions, and discerned the following pattern: "a class action waiver will not be found unconscionable if the plaintiff had a meaningful opportunity to reject the contract term or if the agreement containing the waiver is not burdened by other features limiting the ability of the plaintiff to obtain a remedy for the particular claim being asserted in a cost-effective manner. If the agreement is so burdened, the 'right to seek classwide redress is more than a mere procedural device.'" *Id.* at 41. Ultimately, then, the Court held the class waiver unenforceable, explaining,

> These circumstances include a contract of adhesion that requires the customer to arbitrate all claims, but does not reveal the cost of arbitration, and contains a liquidated damages clause that allegedly operates as an illegal penalty. These provisions operate together to create a situation where the cost of vindicating the

claim is so high that the plaintiff's only reasonable, cost-effective means of obtaining a complete remedy is as either the representative or a member of a class.

*Id.* at 42.

The language of the agreement in *Kinkel* is very similar to the policy which Morton's purportedly distributes to its job applicants. Accordingly, if this Court decides that the arbitration policy submitted by Defendant is in fact the policy to be examined in this matter, this Court should follow the Illinois Supreme Court's analysis in *Kinkel*, and hold that the arbitration policy at issue here is unconscionable and unenforceable.

<u>Applicability of Morton's Policy is Questionable</u>

Initially, there is a real question about whether Plaintiff ever agreed to be bound by this particular policy; and the affidavit submitted by Defendant in support of its motion does not answer that question. Defendant has produced a receipt by Plaintiff "of the Morton's of Chicago MAV Inc.'s Mandatory Arbitration Policy and Procedure For Resolving Disputes Arising Out Of The Employee's Employment Or Termination of Employment."(*sic*), Deft.'s Motion, Exhibit A2. Defendant has also produced Morton's Of Chicago/Wacker Place LLC Mandatory Arbitration Policy And Procedure For Resolving Disputes Arising Out Of Its Employees' Employment Or Termination Of Employment (*sic*). Deft.'s Motion, Exhibit A1. However, there is no evidence that the receipt (Ex. A2) evidences receipt of *that particular* Policy (Ex. A1), and the receipt and policy obviously have different, though very similar, titles. Morton's Human Resources Information Systems Manager, Angela Thomas, apparently maintains records for all the Morton's restaurants, both Morton's, and its subsidiaries, including Morton's of Chicago/Wacker Place LLC. Deft's Motion, Ex. A. Her affidavit states that Exhibit A2 attached to Defendant's motion is a copy of the form signed by Plaintiff, "acknowledging his

receipt of the Arbitration Policy" (Affidavit, Ex. A, ¶6); but, very importantly, the affidavit does not recite that the policy which Plaintiff actually received is the same policy as the document appearing at Exhibit A1.  In fact, it seems implausible that Ms. Thomas could testify that it was.

Moreover, a careful review of the language of the policy calls into significant doubt whether the policy attached to Defendant's motion is the policy Plaintiff actually received when he applied for his employment with Morton's in December 2004.  Paragraph A(2)(d) of Defendant's policy states that any arbitration would be conducted in accordance with "the then governing Employment Arbitration Rules of the American Arbitration Association ("AAA")". However, the AAA completed an extensive overhaul of its employment rules; and new rules became effective in July 2006, titled "Employment Arbitration Rules."  *See*, Exhibit 1, p. 1. Prior to that time,  AAA's rules were known as "the National Rules for the Resolution of Employment Disputes".  *See*, Exhibit 1, p. 1.  It is at least suspect that Defendant has produced a policy that Plaintiff purportedly received in late 2004, but containing a title for the AAA's rules that was not officially used by the AAA until July, 2006.  Thus, Defendants have not and likely cannot establish that the particular policy which forms the basis for their arbitration demand, and their motion to dismiss, was actually received by Plaintiff, and the Court should deny Defendant's motion for this reason alone.

<u>Morton's arbitration policy is procedurally and substantively unconscionable</u>

Assuming *arguendo* that the policy attached to Morton's motion is the actual policy at issue here, the policy is unconscionable, both procedurally and substantively, for several reasons. It is unquestionably a contract of adhesion which significantly impairs Plaintiff's statutory rights. It also fails to inform Plaintiff of the arbitration costs he will incur, and contains at least one non-reciprocal provision.  In addition, the policy prohibits Plaintiff from pursuing his claims on a

class or collective basis, thereby depriving him of substantive statutory rights and hindering his ability to pursue his claims in an efficient and cost-effective manner.  For all of these reasons, this Court should find the policy to be unconscionable and unenforceable, and accordingly should deny Defendant's motion.

*Procedural unconscionability*

Similar to the contract described in *Kinkel*, the employment arbitration policy drafted by Morton's, and the circumstances surrounding its execution by Plaintiff, are procedurally unconscionable.  First, the policy is clearly a contract of adhesion that unfairly restricts Plaintiff's statutory rights under the Illinois wage laws.  Defendant does not even suggest that its arbitration policy could be or has in any way ever been "negotiated" by a potential or actual employee.  While the Court in *Kinkel* held that this fact alone does not automatically render the contract procedurally unconscionable, it is certainly a strong factor to consider in the analysis. Here, the arbitration policy was drafted solely by Morton's, was presented to Plaintiff on a take-it-or-leave-it basis, and was given to Plaintiff as a condition to Plaintiff's acceptance of Morton's offer of employment.[3]  Such facts clearly show the inherent disparity of bargaining power between the parties.  Moreover, the fact that this policy arose in the context of an offer of employment demonstrates that the facts here are more egregious than those in *Kinkel*, which involved a consumer transaction.  Certainly, a policy governing Plaintiff's basic ability to earn a

---

[3] While defendant correctly cites *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) and *Melena v. Anheuser-Busch, Inc,*. 219 Ill.2d 135 (2006), for the general proposition that the court will enforce arbitration agreements in the context of employment disputes, these cases are distinguishable on this point.  In *Melena*, the Illinois Supreme Court examined the enforceability of the agreement only in the context of whether a sufficient offer, acceptance and consideration were established to support the validity of the agreement.  It did not examine whether the arbitration agreement was unconscionable, as it did in *Kinkel*.  Instead, the only reference to unconscionability in *Melena* is that the tender of an agreement to an employee on a take it or leave it basis was not enough, *by itself*, to render the agreement unconscionable.  This holding is consistent with the Court's subsequent, similar statements in *Kinkel*.

10

living and involving his non-waiveable rights[4] under federal and Illinois employment and wage

laws should be scrutinized even more carefully than a dispute regarding a consumer's ability to

enter into a service contract to buy or service a fungible consumer item.  Thus, all of these

circumstances show a level of "impropriety during the process of forming the contract depriving

a party of a meaningful choice."  *Kinkel*, 223 Ill.2d at 23.  Here, Plaintiff had no meaningful

choice – assuming he ever read the arbitration policy, he either agreed to accept the legal

constrictions of the policy, or to remain unemployed.  *See, e.g., Melena v. Anheuser-Busch, Inc.*,

219 Ill.2d 135, 164 (2006) (Kilbride, J., dissenting)("By being economically coerced into signing

a take-it-or-leave-it employer-mandated arbitration agreement just to maintain employment, the

employee is often unwittingly stripped of the future ability to treat issues on a case-by-case basis.

. . . Common sense and experience dictate that. . . employees accept the provisions solely in

order to keep their current jobs.").  Collectively, these facts demonstrate the procedural

unconscionability of Defendant's policy.

In addition, another significant similarity between this case and the *Kinkel* case is that the

arbitration policy here is silent about the cost to Plaintiff to utilize the arbitration process.[5]  Just

as in *Kinkel*, the only potential reference to Plaintiff's costs pertaining to arbitration is buried in

legalese in paragraph A(2)(d) of Defendant's policy, which provides that "the arbitration shall be

conducted in accordance with the then governing Employment Arbitration Rules of the

---

[4] *See, e.g., Ladegaard v. Hard Rock Cutters*, 2001 WL 1403007 at p. 4 (N.D.Ill. Nov. 9, 2001) (citing and quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981)("This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and overtime pay under the Act.")).

[5] Significantly, however, Defendant made it a point to include a specific paragraph in the policy which provides that all of the costs and attorneys' fees to enforce the policy shall be paid by the prevailing party. *See*, Arbitration Policy, ¶ B(4).  While this provision is facially neutral, it is practically beneficial only to Defendant.

11

American Arbitration Association ("AAA") in effect at the time a demand for arbitration is made. . . ." Despite Defendant's arguments to the contrary, this provision does not inform Plaintiff of his cost to demand or utilize the arbitration procedures – unless he happens to be independently and intimately familiar with the Arbitration Rules of the American Arbitration Association and their applicability, a familiarity surely lacking amongst most restaurant workers. As in *Kinkel*, here Defendant repeatedly asserts in its motion that Plaintiff's costs are capped at $150. Yet, this figure does not appear anywhere in Defendant's policy, and Defendant does not cite to any provision of the policy to show that Plaintiff would have been informed of this or any other cost. Thus, Defendant provided absolutely no indication to Plaintiff regarding the costs of arbitration.

Moreover, unlike in *Kinkel*, nowhere does the policy state that the AAA rules are actually incorporated into the policy by reference. Also, similar to *Kinkel*, Plaintiff here was never provided with a copy of the AAA rules pertaining to employment disputes. Further, unlike in *Kinkel*, the policy here does not inform Plaintiff that the AAA rules are available upon request, nor does it direct Plaintiff as to how to obtain such rules. Significantly, even presuming that the AAA rules are incorporated by reference into Defendant's policy, it would be extremely unlikely for Plaintiff to know that the AAA rules pertaining to employment disputes had been extensively revised between the time that Plaintiff began his employment with Defendant and the filing of this claim.[6] Thus, even if Plaintiff somehow discovered a way to obtain the AAA rules at the

---

[6] According to its website, AAA "undertook an extensive review of the National Rules for the Resolution of Employment Disputes." *See*, Exhibit 1, Summary of Changes [of] Employment Arbitration Rules and Mediation, attached hereto. The revisions took two years to complete, and were deemed effective as of July 1, 2006. *Id*.

time he began his employment with Defendant, those rules would still fail to inform him of the <u>current</u> cost to proceed with arbitration.

In addition, the current cost to an employee of demanding and engaging in arbitration varies significantly depending on whether the dispute purportedly governed by Defendant's arbitration policy is categorized as a dispute arising out of an "Employer-Promulgated Plan", or an "Individually-Negotiated Employment Agreement or Contract".  *See*, Exhibit 1, Summary of Changes [of] Employment Arbitration Rules and Mediation, p. 5.  Under an employer-promulgated plan, the employee's filing fee is capped at $150, while under an individually negotiated agreement, the costs and expenses of the parties are bourne equally by the parties.  *Id.*  However, the AAA's summary indicates that "the AAA makes an initial determination as to whether a dispute arises from an employer-promulgated plan or an individually negotiated employment agreement or contract."  *Id.*  Thus, even if Plaintiff was able to obtain the current version of the AAA rules, he would still be unable to determine exactly how to categorize his dispute, and therefore he would also be unable to determine his cost to proceed with arbitration, despite Defendant's claims to the contrary.

As a result, although the policy here is nearly identical to the agreement in *Kinkel* in its absence of information about the cost to Plaintiff to demand arbitration, there are certain significant differences between the two documents, and the policy in this case is actually <u>less</u> informative to Plaintiff than the agreement at issue in *Kinkel*.  Accordingly, this Court should follow the precedent established in that case and find that the policy contains at least some degree of procedural unconscionability.  Moreover, the absence of any provision regarding cost, plus the fact that this policy is a contract of adhesion in the employment context, combine to render the entire policy procedurally unconscionable.  As a result, this court should find the

policy to be unconscionable, and should deny Defendant's motion to dismiss on this ground alone.

*Substantive unconscionability*

The arbitration policy here is also substantively unconscionable, for several reasons. First, the policy improperly limits the substantive rights granted to Plaintiff by the federal wage laws, because it contains a provision which prohibits Plaintiff from pursuing his claims on a class or collective basis, and it also prohibits consolidation of claims. *See*, Arbitration Policy, ¶ B(7). This wholly undermines the legislative policy considerations underlying the Fair Labor Standards Act (the "FLSA"). The FLSA was enacted to ensure that workers are paid the full amount of wages due to them, in order to maintain a minimum standard of living necessary for the health, efficiency, and general well-being of the employees. *See*, 29 U.S.C. § 202. If an employee is being paid less than the full amount of wages owed to them, the employee may invoke his or her statutory right to file suit and collect unpaid wages. *See*, 29 U.S.C. § 216(b). The employee has the statutory right to pursue such claims on a collective basis. *See*, *id*. Presumably, this right is granted to an employee to allow him to file a claim against his employer for unpaid wages in a manner that is efficient and cost-effective for the employee; and denial of that right undermines the purpose of those laws. Accordingly, the policy's prohibition on class or collective actions violates both the substantive rights granted to Plaintiff by the federal wage laws and the policy considerations underlying those laws.

The class and collective action prohibition also renders the policy unconscionable because it limits the powers of the arbitrator, and because it demonstrates a significant internal inconsistency in the policy. The policy states that the arbitrator "shall have the authority to award such relief for a particular claim as may be available in a court of law." Arbitration

14

Policy, ¶ A(2)(d).  However, the policy also states that "consolidation of claims brought by separate employees ... is prohibited" (Arbitration Policy, ¶ B(7)), and that the arbitrator "shall have no authority to add to, or delete from, or modify in any way the provisions of this Policy." Arbitration Policy, ¶ B(9).  These provisions are inconsistent, and directly conflict with each other.  Since the FLSA explicitly provides that collective actions may be maintained to pursue damages for any relevant wage law violations, Plaintiff in his prayers for relief specifically requested that the action be certified as a collective action.  Yet, while paragraph A(2)(d) of the policy purportedly allows the arbitrator to award any relief that may be available in a court of law, paragraphs B(7) and (9) prohibit the arbitrator from resolving employee claims on a class, collective, or consolidated basis, despite the fact that such options are clearly contemplated and authorized by the FLSA.  This internal conflict between various provisions of the policy is blatant, highly confusing to the employee, and should render the policy unconscionable.

Another significant inconsistency in the policy pertains to the procedure to modify the policy.  The receipt purportedly signed by Plaintiff pertaining to Defendant's policy states, "I understand that the Arbitration Policy cannot be modified except in writing signed by both the President of Morton's and me."  *See*, Receipt, attached to Deft.'s Motion as Exhibit A2. However, the policy by its own terms allows for a modification without requiring any written consent from either Plaintiff or the president of Morton's, in Paragraph A(2)(d) of the policy. That paragraph states, "Except as otherwise provided herein, the arbitration shall be conducted in accordance with the then governing Employment Arbitration Rules of the American Arbitration Association in effect at the time a demand for arbitration is made."  Arbitration Policy, ¶ A(2)(d).  As explained above, the AAA significantly modified its rules pertaining to employment disputes, effective as of July 1, 2006.  Accordingly, the rules pertaining to and governing

arbitration under Defendant's policy would vary significantly, depending on when the demand for arbitration was made.  Indeed, this provision essentially allowed Defendant's policy to be significantly modified on July 1, 2006, without Plaintiff's consent.

One of the most significant changes that appears to have resulted from this modification pertains to Plaintiff's cost to demand and proceed with arbitration.  The AAA's website indicates that prior to those changes (i.e., at the time Plaintiff received Defendant's policy), the cost of arbitration was detailed in an "Administrative Fee Schedule section".  *See*, Exhibit 1, p. 5. While it is unclear what the exact cost to demand arbitration was at that time, it is clear that the cost provisions have been extensively revised, and have also been separated into two separate provisions, depending on the type of plan or agreement out of which the dispute arises.  *Id.* Moreover, the AAA makes the initial determination as to which provision applies to each dispute, *id.*, and therefore Plaintiff would have no way of knowing what his cost would be to demand arbitration, prior to his actual making of the demand.  Each of these changes, as well as the other changes to the arbitration rules detailed on the 6-page summary provided by AAA, indicate that extensive modifications were made to the AAA rules and, correspondingly, Defendant's policy, without Plaintiff's consent.  This is yet another reason to find Defendant's policy substantively unconscionable.

A separate reason for a finding that Defendant's policy is substantively unconscionable relates to the level of sophistication necessary to proceed with these claims.  The Complaint here alleges claims centered on Defendant's failure to pay proper overtime wages to its "tipped" employees, and those claims involve intricate knowledge of the federal wage laws.  Certainly, the typical restaurant employee cannot be expected to know the body of law surrounding the applicability of tip credits to minimum wage employees, or the computation of the correct

16

amount of overtime wages to be paid to tipped employees, as that law has been interpreted pursuant to the FLSA. Indeed, this Court will certainly face a variety of legal arguments about the application of those laws in this case, if, as it should, this Court permits Plaintiff and putative class to proceed here with their claims that Defendant's scheme of failing to pay overtime is wrongful. As a result, and similar to *Kinkel*, it is highly unlikely that Plaintiff would have recognized that he could bring such claims against Morton's without the assistance of a lawyer, and he certainly requires a lawyer to help him vindicate those claims. However, as the Court explained in *Kinkel*, it would almost certainly be more difficult for Plaintiff to hire an attorney if the attorney knew that Plaintiff was required to proceed with his claims through arbitration, and on an individual basis. Accordingly, this is yet another factor demonstrating the substantive unconscionability of Defendant's arbitration policy.

Moreover, Plaintiff's ability to pursue his claims on a collective basis is central to his ultimate success in this matter. This case is a prime example of the type of claim in which a plaintiff could incur a significant amount of costs and attorneys' fees to vindicate his claim, and yet his overall recovery could be relatively minimal, and significantly less than the reasonable fees he will incur. In other words, this case is a prime example of the type of claim an individual would find daunting to bring. While Defendant will argue that the policy does not preclude a fee award for an individual claimant in arbitration, the chilling effect on bringing such a claim is obvious (and very likely the point of Defendant having instituted its policy in the first place): most lawyers will not undertake the extensive discovery involved to prove this type of claim on behalf of a single plaintiff in an arbitration, before an arbitrator who may decide to arbitrarily award no fees or damages, and issue a one-page decision setting forth limited findings of fact or conclusions of law upon which an appeal might be based.

The scope of discovery in this case will likely be extensive, but also necessary to vindicate Plaintiff's claims. Yet, as in *Kinkel*, the end result could fail to make plaintiff whole, as the amount of damages that plaintiff may recover could potentially be less than the amount of costs and fees that he will incur to pursue his claims.  This cost-price disparity, a factor addressed by the *Kinkel* court, could be mitigated to a great extent if Plaintiff is allowed to pursue his claims on a collective basis.  Such an option would not only distribute Plaintiff's costs among the class members, but it would also allow other employees who have similar claims and incurred similar damages to have their claims addressed, efficiently, as well.  Accordingly, Defendant's ban on class or collective actions demonstrates the cost-price disparity resulting from Defendant's arbitration policy, and renders it substantively unconscionable.

The policy is also substantively unconscionable because it one-sided – it essentially is a policy that is of significant benefit to the employer, but is of very little, if any, value to the employee.  First, the policy's prohibition on class or collective claims applies only to the employees, and not to Morton's.  Although technically drafted in a neutral manner, it would be an extremely rare instance for an employer to file suit against its employees at all, let alone on a class or collective basis.  *See, e.g., Kinkel v. Cingular Wireless LLC*, 357 Ill.App.3d 556, 565 (5th Dist. 2005), *aff'd ,*223 Ill.2d 1 (citing *Szetela v. Discover Bank*, 97 Cal.App.4th 1094 (2002). *See also*, *Vasquez-Lopez v. Beneficial Oregon, Inc.*, 210 Or.App.553, 569-71(2007); *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1175-76 (9th Cir. 2003)("We cannot conceive of any circumstances under which an employer would bring a class proceeding against an employee."). On the other hand, it would not be unusual for an employee to file a suit against his employer on a class or collective basis if the employee's co-workers had also been subjected to the same wrongful practices committed by the employer.  There are many monetary and efficiency

18

considerations which would cause the employee to do so.  Thus, due primarily to monetary considerations, the collective action waiver in this case has the practical effect of discouraging employees from asserting any employment-related claims against Defendant.  In the rare instances in which an employee does assert an entirely valid claim against Defendant, the prohibition on collective actions essentially allows the employer to continue to commit the same violations and harm its other employees on a daily basis, while gathering information and developing a technique to avoid potential liability in not only the case at hand, but any similar cases which may arise.[7]  Stated differently, Defendant's practice allows it to deliberately cheat large numbers of employees out of individually small sums of money, without an effective recourse method for the employees.  Such a scheme was not contemplated under the federal wage laws, and should not be tolerated.  Accordingly, in this case, the collective action waiver is certainly for the benefit of Defendant only; and that fact demonstrates another degree of substantive unconscionability in the policy.

Similarly, the policy also contains a provision that if any party is required to take steps to compel arbitration and is successful in doing so, that prevailing party "shall be entitled to recover his, her or its reasonable costs and attorneys' fees in such an action."  Arbitration Policy, ¶ B(4).  While this provision appears to be reciprocal on its face, in practice it is much more likely that Defendant will be the party that seeks to compel arbitration, rather than the employee. This is so for two main reasons.  First, as indicated above, it would be highly unlikely that Morton's would have any need to sue one of its employees, much less to sue all of them on a class-wide basis.

---

[7] Indeed, the exhibits attached to Defendant's Motion indicate that they have raised and litigated this issue numerous times in various courts.

Second, even if Morton's did decide to sue one of its employees, it is extremely unlikely that the employee would know to demand arbitration. Indeed, depending on the duration of employment, it is possible that the employee may not even remember having received the policy document, let alone contemplate its potential use. Accordingly, despite the technical drafting of the paragraph at issue, it is clear that the provision is clearly intended to benefit only Defendant. As such, the provision demonstrates another element of substantive unconscionability within the policy.

Finally, Defendant's policy is substantively unconscionable because it contains at least one non-reciprocal provision. Paragraph A(9) of the Policy provides that if an employee commences a lawsuit against a current or former supervisor, agent, or employee of Morton's, such claims "shall, *at the option of Morton's*, be submitted to final and binding arbitration....." (*emphasis supplied*). This provision is clearly one-sided, and courts have held that such non-reciprocal provisions are to be considered in determining whether an arbitration policy is unconscionable. *See, e.g.*, *Ingle v. Circuit City Stores, Inc*., 328 F.3d 1165 (9th Cir. 2003).

In sum, Plaintiff has demonstrated that the policy is substantively unconscionable for the following reasons: (1) the policy undermines the policy considerations of the federal wage laws; (2) the policy contains a class and collective action waiver which and deprives Plaintiff of the substantive rights granted to him by the wage laws; (3) the policy deprives the arbitrator of the ability to conduct such arbitrations on a class, collective, or consolidated basis, and therefore limits the ability of the arbitrator to award relief to the full extent available by law; (4) the policy contradicts its own terms and allows modifications to be made without the consent of Plaintiff; (5) the nature of the underlying claims are such that Plaintiff is required to obtain a lawyer to attempt to vindicate his claims; (6) the cost-price disparity that Plaintiff will confront in pursuing

his claims is egregious; (7) the policy is significantly one-sided, and it allows Defendant to continually commit violations of the federal wage laws and harm its employees, while at the same time gaining experience in defending individual claims; and (8) the policy contains various provisions which are not reciprocal, either explicitly or in practical effect. As a whole, these reasons combine to render the arbitration policy substantively unconscionable. As a result, this Court should deny Defendant's motion to dismiss and compel arbitration, and instead should allow this case to proceed in this forum, on a classwide basis.

The collective action waiver in Morton's arbitration policy
is procedurally and substantively unconscionable

Alternatively, in the event that this Court finds the arbitration policy to be enforceable, the Court should separately analyze the collective action waiver provision of the policy (paragraph B(7))[8] and strike it down as unconscionable. The waiver is unconscionable for many of the reasons described above – it deprives Plaintiff of substantive rights provided to him under the Illinois wage laws, undermines the policy underlying the Illinois wage laws, fails to inform Plaintiff of the costs of arbitration, results in a cost-price disparity that certainly lies in favor of Defendant, and wholly impinges upon and destroys the rights of the arbitrator to decide whether to conduct and evaluate the arbitration in a classwide or collective manner.

*The case law cited by Defendant is inapposite*

In its motion, Defendant cites various cases to support its argument that the collective action waiver contained in its arbitration policy is valid and enforceable. However, these cases are distinguishable from the case at hand, for several reasons. For instance, Defendant's own

---

[8] As previously explained, the waiver precludes all class actions, collective actions, and consolidation of employee claims. However, throughout this portion of the brief, the waiver may be referred to as the "collective action waiver".

motion indicates that the cases of *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359 (11th Cir.

2005) and *Adkins v. Labor Ready, Inc.*, 303 F.3d 496 (4th Cir. 2002), were not decided pursuant

to Illinois law.  The court in *Caley* examined Georgia law, and the court in *Adkins* examined

West Virginia law, in reaching their respective decisions.  Accordingly, those cases cannot be

reviewed as binding precedent in this matter.

In addition, Defendant cites *Livingston v. Associates Finance, Inc.*, 339 F.3d 553 (7th Cir.

2003) for the proposition that because Plaintiff's arbitration costs will purportedly be capped at

$150, Plaintiff can assert his claims in a cost-effective manner.  *See*, Deft.'s Motion, p. 9-10.

However, the *Livingston* case is distinguishable from this case because the arbitration agreement

in *Livingston* addressed the issue of the plaintiff's cost to demand and pursue arbitration.  Here,

on the other hand, Defendant's policy fails to set forth in any manner Plaintiff's cost to demand

arbitration, and instead allows the AAA to make the initial determination about the type of

dispute at issue, which in turn prescribes the allocation of arbitration costs among the parties.  In

addition, the Court of Appeals for the Seventh Circuit in *Livingston* does not discuss whether the

arbitration agreement, or any provision of it, is unconscionable under Illinois state law.  And the

Court certainly does not discuss the all of the factors pertaining to unconscionability as set forth

by the Illinois Supreme Court in *Kinkel*; indeed, the Court of Appeals could not have done so,

because *Kinkel* was decided three years after the *Livingston* decision.  Instead, the decision in

*Livingston* focuses on the narrow issue of whether the cost to plaintiff to demand arbitration was

prohibitively high.  In contrast, as demonstrated by this brief, Plaintiff here is challenging the

validity of Defendant's arbitration policy in general, and the validity of the policy's collective

action waiver in particular, under the standards as set forth in *Kinkel*.  Thus, the issues in this

case, and the case law and analysis which guide the resolution of those issues, are significantly

different than those addressed in *Livingston*.

Defendant also cites *Harris v. The DirectTV Group*, 2008 WL 342973 (N.D.Ill. Feb. 5,

2008) as an example of a case following *Kinkel* in which a class action wavier was upheld.

However, *Harris* is also distinguishable from the instant case in several respects.  First, *Harris*

involved an arbitration clause in a consumer agreement.  As discussed above, examination of

arbitration provisions in the employment context should be subject to a higher standard of

scrutiny than those in consumer agreements.  In addition, the provision in *Harris* explicitly set

forth the plaintiff's cost to demand and use arbitration.  In contrast, Morton's agreement is

completely silent on the issue of cost to either party to demand arbitration.  Finally, the claim

involved in *Harris* is significantly distinguishable from the claim alleged here.  *Harris* filed a

claim pursuant to the Fair and Accurate Transactions Act, based on the defendant's alleged

failure to truncate the credit card expiration date on his receipt; that claim did not involve any

intent on Defendant's part to cheat plaintiff or the putative class out of any amount of money.

By contrast, the claim in this case involves Defendant's calculated and systematic failure to pay

overtime to its employees.  In the aggregate, then, Morton's scheme allows it to significantly

profit at the expense of those employees.  For all of these reasons, the cases cited by Defendant

are inapposite; and the Court should instead focus on and use the analysis in *Kinkel* to find that

the collective action waiver contained in Defendant's policy is both procedurally and

substantively unconscionable.

*Procedural unconscionability*

As explained in *Kinkel*, the collective action waiver must be analyzed in the context of

the policy as whole.  In this case, and as described above, the collective action waiver

significantly harms Plaintiff because it is contained in the arbitration policy, and that policy is a contract of adhesion which fails to inform Plaintiff of the costs he will incur in arbitration.

As set forth above, the collective action waiver in this case is contained within a contract of adhesion.  Here, the arbitration policy was drafted by Morton's and was given to Plaintiff as a condition to Plaintiff's acceptance of Morton's offer of employment.  Significantly, neither of the papers that Plaintiff was required to sign prior to accepting his employment indicate that he actually read the policy.  Moreover, the fact that this policy and the corresponding collective action waiver arose in the employment context is also significant, as Plaintiff's "decision" to accept or reject the policy is essentially illusory – if Plaintiff did not accept the policy, his ability to earn a living would be impaired.  Thus, Plaintiff's lack of meaningful choice pertaining to his acceptance of the collective action waiver is clear, and demonstrates the procedural unconscionability inherent in Plaintiff's acceptance that provision.

In addition, as in *Kinkel*, the arbitration policy here is silent regarding the cost to plaintiff to demand and use the arbitration process.  As explained above, the only reference to the costs Plaintiff may incur during arbitration is in paragraph A(2)(d) of the policy, which merely references the AAA rules in effect at the time the claim is raised, and therefore can be (and has been) modified at any time.  The policy does not even state that the cost to Plaintiff to demand arbitration will be found in the AAA rules; instead, the policy wholly fails to mention cost. Thus, the policy here is nearly identical to the agreement in *Kinkel* regarding the explanation of the cost to Plaintiff to demand arbitration, and this Court should follow the Illinois Supreme Court's decision in *Kinkel* and find that the policy here, including the collective action waiver, contains a degree of procedural unconscionability.  However, because the waiver is contained

24

within a contract of adhesion in the employment context, this Court should extend the analysis in *Kinkel* and hold that the collective action waiver is procedurally unconscionable.

*Substantive unconscionability*

The collective action waiver is also substantively unconscionable, for many of the reasons set forth above. First, the collective action waiver by its terms limits the substantive rights granted to Plaintiff by the FLSA. As explained above, the FLSA explicitly grants Plaintiff the right to proceed with his case as a collective action. Thus, the collective action waiver in the policy inherently conflicts with that substantive right, and should not be upheld.

The collective action waiver also subverts the policy considerations underlying the FLSA. The federal wage laws were drafted with the intent to ensure that an employee earns the full amount of wages due to him, in order to sustain his ability to earn a living. The wage laws also specifically provide that an employee may initiate a private cause of action to enforce those non-waiveable rights, and that he may do so on a classwide or collective basis. Here, the collective action waiver in Morton's arbitration policy significantly undermines those policy considerations by stripping Plaintiff of one of the potentially most effective methods to enforce his rights under the wage laws. Accordingly, the collective action waiver does not comport with the basic considerations of the statute at issue in this case, and should be struck down as unconscionable.

The collective action waiver is also unconscionable because it limits the powers of the arbitrator, and demonstrates a significant internal inconsistency in the policy. As explained above, the policy purports to grant the arbitrator the ability to award Plaintiff any relief that may be available in a court of law. However, paragraphs B(7) and (9) prohibit the arbitrator from resolving employee claims on a collective basis, despite the fact that such an option is clearly

25

contemplated and authorized by the FLSA.  This internal conflict between various provisions of the policy is blatant, highly confusing to the employee, and should render at least the collective action waiver, if not the entire policy, unconscionable.

In addition, this case involves claims stemming from Defendant's failure to pay overtime wages to its tipped employees.  Those claims involve specialized knowledge of the federal wage laws, such that Plaintiff has been required to retain an attorney to recognize and vindicate his claims.  Without the ability to pursue his claims on a collective basis, however, it probably would have been significantly more difficult for Plaintiff to hire an attorney to pursue such claims.  This point also ties into the cost-price disparity factor of substantive unconscionability. *See*, *Kinkel*, 223 Ill.2d at 30.  As explained above, due to the type and breadth of discovery required here, this case is a prime example of the type of claim in which Plaintiff could incur a significant amount of costs and attorneys' fees in pursuing his claim, and yet result in a relatively minimal overall recovery which would fail to make Plaintiff whole.  However, this cost-price disparity could be mitigated to a great extent if Plaintiff was not subject to the collective action waiver.  Proceeding on a collective basis would allocate Plaintiff's costs among the class members, and would allow other similarly-situated, wronged employees to pursue their claims as well.  Accordingly, the collective action waiver here has the effect of significantly reducing (if not abolishing) Plaintiff's ability to recognize and pursue his claims in a cost-effective and judicially efficient manner; and as a result, it should be deemed substantively unconscionable.

Finally, the collective action waiver should be deemed substantively unconscionable because it is so one-sided as to oppress the innocent party.  *Kinkel*, 223 Ill.2d at 28.  As explained above, while seemingly drafted in a neutral manner, the prohibition on instituting collective actions effectively applies only to employees of Defendant, and not to Defendant

itself.  This effect is inherently due to the fact that Defendant is highly unlikely to file suit

against any of its employees, and almost certainly would not have reason to do so on a classwide

or collective basis.  *See*, *Kinkel*, 357 Ill.App.3d at 565; *see also*, *Ingle*, 328 F.3d at 1175-76.  In

contrast, it is certainly reasonable for an employee of Defendant to initiate a claim against

Defendant on a classwide or collective basis.  Doing so would allow the employee to vindicate

the rights of himself and his similarly situated co-workers in an efficient and cost-effective

manner.  Indeed, that is exactly the reason that Plaintiff in this case seeks to pursue his claims on

a collective basis.  However, the policy as drafted prohibits this result; and in turn it allows

Defendant to deliberately cheat large numbers of employees out of individually small sums of

money, without an effective method of recourse for the employees.  Moreover, this scheme

allows Defendant to continue gaining experience in defending such claims, and to continue

violating the federal wage laws.  In effect, then, Defendant clearly profits by depriving its

employees of their basic, earned wages, and Defendant has continued this practice for many

years.  Such a scheme is clearly unconscionable; accordingly, the collective action waiver is

should be struck down by this Court.

   In sum, the collective action waiver contained in this policy is unconscionable, both

procedurally and substantively.  The waiver is exactly the type of waiver that the Court in *Kinkel*

described as unconscionable, as Plaintiff did not have a meaningful opportunity to reject that

contract term, and because the policy as a whole is "burdened by other features limiting the

ability of the plaintiff to obtain a remedy for the particular claim being asserted in a cost-

effective manner."  *Kinkel*, 223 Ill.2d at 41.  Moreover, this case contains nearly identical

circumstances as those found in *Kinkel*, in which the waiver was struck down: "this case arose

due to a contract of adhesion that requires the [employee] to arbitrate all claims, but does not

reveal the costs of arbitration." *Id.* at 42.  The only difference between the two waivers is the type of claim involved.  *Kinkel* addressed the enforceability of a "liquidated damages clause that allegedly operate[d] as an illegal penalty." *Id.*  This case involves the enforceability of a waiver that harms Plaintiff's ability to vindicate his non-waiveable rights under the federal wage laws on a collective basis, while allowing Defendant to continue its scheme of defrauding its employees out of small but significant sums of money.  Surely such an issue is just as significant as the issue in *Kinkel*.  Accordingly, the collective action waiver should be deemed unconscionable.

Paragraph B(3) of the policy allows unenforceable provisions of the policy to be severed from the remainder of the document.  Accordingly, if this Court determines that the arbitration policy as a whole is not unconscionable (and therefore enforceable), the Court should evaluate the collective action waiver separately, should deem this provision unconscionable and unenforceable, and should sever this provision from the rest of the policy.  Such a result would not negatively impact the parties, as AAA has promulgated rules to conduct class or collective arbitrations.

## CONCLUSION

For the reasons set forth above, this Court should find the arbitration policy to be both procedurally and substantively unconscionable, and hold the policy unenforceable.  In the alternative, in the event this Court holds that the arbitration policy is enforceable, this Court should find the collective action waiver to be procedurally and substantively unconscionable and unenforceable, and should sever that provision from the remainder of the document.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order denying

Defendant's Motion to Dismiss Class Action Complaint and Compel Arbitration, and granting

such further relief as this Court deems equitable and just.

Respectfully submitted,

PAUL TURNER, individually and on behalf
of a class of persons similarly situated,


/s/ Catherine P. Sons
One of Plaintiff's Attorneys


James X. Bormes                          Carol Coplan Babbitt
Law Office of James X. Bormes, P.C.      Law Office of Carol Coplan Babbitt
8 South Michigan Avenue                  35 East Wacker Drive
Suite 2600                               Suite 650
Chicago, Illinois 60603                  Chicago, Illinois 60601
(312) 201-0575                           (312) 435-9775
#6202568                                 #6199651

Jeffrey Grant Brown
Catherine P. Sons
Converse & Brown, LLC
105 West Adams Street
Suite 3000
Chicago, Illinois 60603
(312) 789-9700
#6194262

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

Summary of Changes Employment Arbitration Rules and Mediation PROCEDURES
(formerly the National Rules for the Resolution of Employment Disputes)
Amended and Effective July 1, 2006

Over the past two years, the American Arbitration Association (AAA) undertook an extensive review of the National Rules for the Resolution of Employment Disputes. This was the first comprehensive review of these rules since their inception in 1996. Optional Rules for Emergency Measures of Protection have been added to these rules. Also, the Administrative Fee Schedule has been renamed the Costs of Arbitration (including AAA Administrative Fees) section. Finally, the rules have been renamed "Employment Arbitration Rules and Mediation Procedures." Below is a summary of the significant changes made to the rules.

Cost of Employment Arbitration

Section was added to provide guidance to users of how the AAA differentiates between employer-promulgated plans and individually negotiated contracts and agreements. Such a determination impacts the various costs and fees associated with a case.

Types of Disputes Covered

Section updated to clarify that these rules do not apply to disputes arising out of independent contractor agreements.

R-1. Applicable Rules of Arbitration

Language was added to require the party seeking a stay of arbitration to provide documentation that judicial intervention had been sought.

R-3. AAA as Administrator of the Arbitration

Rule was amended to allow the AAA to assign the administration of the arbitration to any of its offices.

R-4. Initiation of Arbitration

Subsection (b)(i)(1) rule was modified to provide that a demand for arbitration may be filed within the time limit established by the applicable statute of limitations. Subsections (b)(ii) and (b)(iv) now indicate that if the parties do not file an answering statement to a claim or counterclaim, the claim or counterclaim is deemed denied. Also, the failure to file the answering statement shall not delay the arbitration. Finally, the timeframe in which to file responses to the Demand, a counter claim, and a response to the counterclaim is now 15 days after the date of the AAA's letter acknowledging receipt of the filings.

R-5. Changes of Claim

If a change of claim is filed before the appointment of the arbitrator, the other party shall have 15 days from the date of transmittal to file an answer.

R-6. Jurisdiction

This is a new rule. The arbitrator may rule on his or her own jurisdiction including the existence, scope or validity of the arbitration agreement. The arbitrator may also determine the existence or validity of the contract which contains the arbitration agreement. A determination that the contract is null and void does not itself invalidate the arbitration agreement. Finally, any objection to the jurisdiction of the arbitrator or the arbitrability of the claim or counterclaim must be made within the 15 day time period to file the answering statement.

R-7. Administrative and Mediation Conferences

Rule now provides that parties should provide written confirmation when agreeing to use the mediator as an arbitrator.

R-8. Arbitration Management Conference

The rule was revised to provide the Conference will be held via telephone conference unless the parties agree otherwise. Additional matters to be considered during the Conference have been added to the rule, including: the specification of undisclosed claims; the extent to which documentary evidence may be submitted at the hearing; the extent to which testimony may be admitted at the hearing telephonically, over the internet, by written or video-taped deposition, by affidavit, or by other means; and any disputes over the AAA's determination regarding whether the dispute arose from an individually negotiated employment agreement or an employer promulgated plan.

R-9. Discovery

A provision was added to the rule to clarify that parties do not need to notify the AAA of discovery communications unless a dispute arises. If disputes do arise, the AAA should be notified so that such dispute may be presented to the arbitrator for a determination.

R-10. Fixing of Locale (the city, county, state, territory and/or country of the arbitration)

The title of the rule was changed to clarify the difference between the "locale" of the hearing and the "location" of the hearing. The rule now allows the AAA to make an initial determination on the locale if the parties disagree, subject to the arbitrator making a final determination.

R-11. Date, Time, and Place (the physical site of the hearing within the designated locale) of Hearing

The title of the rule was changed to clarify the difference between the "locale" of the hearing and the "location" of the hearing. The rule requires parties to respond to requests for hearing dates in a timely matter, be cooperative in scheduling, and adhere to the established hearing schedule. The AAA will send notice of hearing at least 10 days prior to the hearing date unless the parties agree otherwise.

R-12. Number, Qualifications, and Appointment of Neutral Arbitrators

In subsection (a), disputes under these rules will be heard by one arbitrator, unless the parties agree otherwise or their arbitration agreement specifies a number of arbitrators. In subsection (b), the "Qualifications" section, previously contained in Rule 11 of the prior version of the Employment Arbitration Rules, was moved into this rule. Also, this subsection applies to "neutral" arbitrators. Finally, under subsection (c), the AAA now will initially provide parties with a list of names chosen from the Employment Dispute Resolution Roster shortly after it receives the Demand.

R-13. Party-Appointed Arbitrators

This new rule describes the process of appointing party appointed arbitrators. This rule also requires party-appointed arbitrators to meet impartiality and independence standards (delineated in R-16), unless the parties specifically agree otherwise.

R-14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties

This new rule addresses the appointment of a chairperson by party-appointed arbitrators or the parties. The language comports with R-13 explained previously.

R-15. Disclosure

This new rule was previously a section of Rule 11 of the previous version of the Rules. The rule has been revised and expanded to (1) require all arbitrators to disclose circumstances likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence; (2) clarify that the disclosure obligation remains in effect throughout the arbitration; (3) confirm the AAA will forward any such disclosures to the parties, and if appropriate to the arbitrators and others and; (4) explain that disclosures made pursuant to the rules are not to be construed as an indication that the arbitrator considers the disclosed circumstances likely to affect his or her impartiality or independence.

R-16. Disqualification of Arbitrator

This new rule was previously a section in Rule 11 of the previous version of the Rules. Additional language has been added to outline an arbitrator's responsibility to be impartial and independent, as well as grounds for disqualification. The rule also clarifies that if the parties agree in writing, that arbitrators directly appointed by the parties pursuant to R-13 need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence. Also, the AAA may now, "on its own initiative," disqualify an arbitrator.

R-17. Communication with Arbitrator

This new rule was previously a section in Rule 22 of the previous version of the Rules. The rule clarifies acceptable and unacceptable ex parte communication with arbitrators or candidates for arbitrator.

R-18. Vacancies

Language was added to provide that in the event a substitute arbitrator is appointed, the panel of arbitrators shall determine whether it is necessary to repeat all or part of any prior hearings.

R-25. Oaths

Oaths taken by the arbitrators will be provided to the parties prior to the first hearing.

R-27. Dispositive Motions

This new rule provides that under certain circumstances, the arbitrator may allow parties to file dispositive motions.

R-28. Order of Proceedings

A section allowing arbitrators to direct the order of proof, bifurcate proceedings and direct parties to focus on issues that could dispose of all or part of the case was moved from Rule 24 of the previous version of the Rules. Language was added to encourage the arbitrator to consider alternative means of presentation of evidence through a variety of technological means.

R-30. Evidence

Rule was clarified that "presence" for the presentation of evidence does not mandate that people must be physically present in the same location. Rule also provides for the process of submission of post-hearing evidence or documents.

R-31. Inspection

The investigation section of the prior version of this rule was removed. Upon the request of a party, the arbitrator may make an inspection in connection with the arbitration.

R-32. Interim Measures

Clarifies that an arbitrator may grant any remedy or relief that would be available had the matter been heard in court. Also, provides that any request for interim measures made to a judicial authority is not incompatible with the agreement to arbitrate or deemed a waiver of the right to arbitrate.

R-34. Reopening of Hearing

Good cause must be shown to reopen a hearing.

R-35. Waiver of Oral Hearing

If procedures for the waiver of an oral hearing cannot be agreed to by the parties, the arbitrator shall specify a fair procedure.

R-36. Waiver of Objection/Lack of Compliance with These Rules

Rule provides that an objection may also be made in a transcribed record as well as in writing.

R-38. Serving of Notice

Clarifies how information, papers, notices, etc. shall be served by the parties, the arbitrator, and the AAA.

R-39. The Award

In subsection (a), three additional days are provided to render the award if briefs are filed or documents submitted after the hearing. Subsection (d) provides that the arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court, including attorney's fees and costs. The arbitrator may also assess arbitration fees in favor of a party subject to the limitations contained in the Costs of Arbitration section (see description below).

R-42. Applications to Court

Subsection (d) has been revised to clarify that parties have consented to relieve the AAA and arbitrators from any liability for any act or omission in connection with the arbitration under the rules.

R-43. Administrative Fees

AAA fees shall be paid in accordance with the Costs of Arbitration Section. Also, a footnote required by California law describing the availability of a waiver of arbitration fee costs for California consumer cases has been moved to the Employer-Promulgated Plan fee section.

R-44. Neutral Arbitrator's Compensation

The section was amended to provide that arbitrator compensation will be borne in accordance with the Costs of Arbitration section.

R-45. Expenses

The rule now provides that expenses will be borne in accordance with the Costs of Arbitration section.

R-47. Suspension for Non-Payment

This new rule provides the circumstances in which the AAA or the arbitrator may suspend the arbitration due to non-payment of arbitrator compensation or administrative charges.

Costs of Arbitration (including AAA Administrative Fees)

This section replaces the Administrative Fee Schedule section contained in the previous version of these Rules. This section breaks down all costs and fees associated with the arbitration and provides for how such costs and fees are to be borne by the parties. There are two separate and distinct costs sections, one for disputes arising out of employer-promulgated plans and the other for disputes arising out of individually-negotiated employment agreements and contracts. As an introductory matter, the AAA makes an initial determination as to whether a dispute arises from an employer-promulgated plan or an individually-negotiated employment agreement or contract. If there are disputes about such determination, the issue can be raised to the arbitrator for a final decision.

For Disputes Arising Out of Employer-Promulgated Plans:

Employers shall pay arbitrator's compensation unless the employee agrees, post dispute, to voluntarily pay a portion of the arbitrator's compensation. In subsection (i), Filing Fees, the non-refundable filing fee for employees is capped at $150. For cases before a single arbitrator, the non-refundable filing fee for employers is $900. There is no filing fee charged for a counter claim. In subsection (v), Abeyance Fee, cases held in abeyance for a year are accessed a $300 annual abeyance fee. If the fee is not paid, the case will be administratively closed by the AAA. In section (vi), Expenses, all expenses of the arbitrator and the AAA shall be borne by the employer. Finally, a footnote addressing fee waivers available to California consumers has been added to this section.

For Disputes Arising Out of Individually-Negotiated Employment Agreements and Contracts:

Unless the parties agree otherwise, arbitrator compensation shall be borne equally by the parties and is subject to reallocation by the arbitrator in the award. Subsection (i) was renamed Filing Fees and Case Service Fees. In subsection (iv), Abeyance Fee, cases held in abeyance for a year are accessed a $300 annual abeyance fee. If the fee is not paid, the case will be administratively closed by the AAA. Finally, in section (v), Expenses, all expenses of the arbitrator and the AAA shall be borne equally by the parties.

OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION

This entire set of optional rules is new to the Employment Arbitration Rules. This provides a mechanism for parties either through their agreements, or post dispute, to have an expedited process to deal with time sensitive issues, prior to the actual arbitration taking place.

Employment Mediation Procedures

This section was renamed as a set of procedures.

M-4. Appointment if the Mediator

This procedure was revised to indicate the AAA will provide parties with lists of mediators from which to choose a mediator.

M-8. Date, Time, and Place of Mediation

Procedure revised to indicate the mediator will set the place of the mediation session.

© 2007 American Arbitration Association, Inc. All rights reserved. These Rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these Rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.

- AAA MISSION & PRINCIPLES
- PRIVACY POLICY
- TERMS OF USE
- TECHNICAL RECOMMENDATIONS
- ©2007 AMERICAN ARBITRATION ASSOCIATION. ALL RIGHTS RESERVED